No. 90-172

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF ARIZONA, KATHLEEN
ROSE SANCIPRIAN, and JERRY
D. COOK, Guardian ad litem
for JULIET MARGARITE ROSE,
a minor child,

    Petitioners and Respondents,

v.

ALAN DOUGLAS SASSE,

    Respondent and Appellant.

**FILED**

NOV 27 1990

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Seventh Judicial District,
In and for the County of Dawson,
The Honorable Dale Cox, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    Kathleen M. Fritsch argued, Glendive, Montana

    For Respondent:

        Ann Hefenieder argued, Department of Social and
Rehabilitation Services, Child Support Enforcement
Division, Billings, Montana (State of Arizona)

        Jerry D. Cook, Glendive, Montana (guardian ad litem
for the child)

Submitted:    September 9, 1990

Decided:    November 27, 1990

Filed:

Clerk

Justice John C. Sheehy delivered the Opinion of the Court.

In this case, Alan Douglas Sasse maintains that the five-year statute of limitations contained in § 40-6-108(1)(b), MCA, bars the court from declaring that he is the natural father of Juliet Margarite Rose, a minor child. The District Court, Seventh Judicial District, Dawson County, rejected Sasse's statute of limitations claim and entered judgment declaring him to be the natural father of Juliet Margarite Rose. From that judgment, Sasse appeals. We affirm the District Court.

The minor child, Juliet Margarite Rose, was born in New Jersey on June 21, 1975. At the time of the child's conception and birth, Kathleen was married to Stelios Kazantzoglou. The mother, Kathleen, had married Stelios in 1971, but was living apart from Stelios and working in Tennessee. At that time, Sasse, age 17, was in the Armed Services and stationed in Tennessee. He frequented the cafe where Kathleen worked and sometime in August or September of 1974, Kathleen invited Alan to her home which resulted in one instance of sexual intercourse. Shortly thereafter, Sasse was transferred to another station.

Kathleen and Stelios divorced in September, 1976, in West Virginia. The court there found that the parties had not lived together as man and wife for over two years and that no children were born to the marriage. Kathleen resumed her maiden name of Rose. On June 24, 1980, an action was brought in the State of Arizona by that state on behalf of Kathleen (who had now married Cesar Sanciprian) against Sasse for determination of paternity and

2

for child support for Juliet. Sasse made a special appearance in that action and it was dismissed for lack of personal jurisdiction over him.

The instant action was begun by Kathleen with the State of Arizona as a co-plaintiff and was transferred to Montana for prosecution, on September 25, 1987, under the Uniform Reciprocal Enforcement of Support Act, when the child was 12 years old. Sasse filed his answer to the complaint, noting that he had no knowledge of Kathleen's marital status at the time of their contact since she was living alone in her apartment, but admitting that he had one occasion of sexual intercourse with her in 1974. In his answer, he did not plead the affirmative defense of the statute of limitations.

The District Court appointed a guardian ad litem for the minor child who was joined as a petitioner by stipulation of the parties.

Pursuant to § 40-6-110, MCA, the District Court caused notice to be given to Stelios Kazantzoglou of the proceedings. He has not intervened or otherwise appeared in the proceedings. The District Court, perceiving that the constitutional validity of the five-year statute of limitations contained in § 40-6-108, MCA, was involved in the action, gave notice to the Attorney General of Montana, who decided not to appear.

The District Court refused to apply the statute of limitations on two principal grounds (1) that Sasse had waived the statute of limitations by not including it in his answer to the complaint, and (2) that in any event, the statute in this case was

3

unconstitutional. We will confine our discussion in this case only to the constitutional issue since we find it dispositive.

By law, Stelios is presumed to be the father of Juliet because he and the mother, Kathleen, were married to each other and the child was born during the marriage. Section 40-6-105(1)(a), MCA. The presumption, however, may be rebutted in an appropriate action by a preponderance of the evidence. Section 40-6-105(2), MCA.

In a case where the existence of the father and child relationship is presumed, an action may be brought for the purpose of declaring the nonexistence of the presumed father and child relationship not later than five years after the child's birth. Section 40-6-108(1)(b), MCA.

On the other hand, an action to determine the existence or nonexistence of the father and child relationship as to a child who has no statutorily presumed father (for example, born out of wedlock) may be brought by the child up to two years after the child attains the age of majority, or may be brought by a state agency under Title IV-D of the Social Security Act before the child attains the age of majority. Section 40-6-108(3), MCA.

On the basis that § 40-6-108 creates a classification which distinguishes for disparate treatment children with presumed fathers and children without presumed fathers, the District Court held the statute in violation of the equal protection guarantees of Art. II, § 4 of the Montana Constitution and the Fourteenth Amendment of the United States Constitution.

4

Our cases on this point do not appear to be consistent. In Borchers v. McCarter (1979), 181 Mont. 169, 592 P.2d 941, we had a case where the mother of a child with a presumed father (born in wedlock) brought an action for support of the child against another man as the alleged natural father. Thus, the mother, in order to obtain support, had to establish a parent-child relationship between the child and a nonpresumed person. To do this she had first to rebut the statutory presumption of paternity in the presumed father. Because she had not rebutted the presumption within five years of the child's birth, this Court held that her claim was barred by the five-year statute of limitations.

In State Department of Revenue v. Wilson (Mont. 1981), 634 P.2d 172, the natural mother of a child born out of wedlock (no presumed father) brought an action to determine the paternity of the alleged natural father. At that time, there was a three-year statute of limitations applicable to this class of action. This Court noted the disparate treatment of children born in wedlock and those born out of wedlock, in that children born in wedlock could bring an action for support against the presumed father at any time within the majority, whereas, under the three-year statute, the child born out of wedlock lost its right of determination of paternity and child support after three years from birth. We there held that the three-year statute was invalid under the Fourteenth Amendment of the United States Constitution because it was "not substantially related to a permissible state interest." Wilson, 634 P.2d at 174.

In Matter of W.C. (1983), 206 Mont. 432, 671 P.2d 621, the child was born in wedlock and thus had a presumed father. The mother and the presumed father were divorced nearly three years after the birth and the final decree stated that the child was born of the parties' marriage. Later, the mother married the alleged natural father, who filed an action to determine the parentage of the child. The District Court dismissed the petition on the basis that the alleged natural father was barred by the five-year statute of limitations from challenging the presumed father and child relationship. In upholding the application of the five-year statute of limitations, this Court distinguished the decisions of the United States District Court in Mills v. Habluetzel (1982), 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 and Pickett v. Brown (1983), 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372, which cases had struck down one-year and two-year statutes of limitations respectively. The distinguishing factor utilized by this Court was that in the case of W.C., there was no question involved of the child's right to support. Since the action was brought by the natural father who was then supporting the child, this Court held that there was no discrimination as between children born in wedlock and those born out of wedlock as to their right to claim support.

In the case at bar, the District Court relied on the holding in Wilson, and decided that the five-year statute of limitations in § 46-6-108, MCA, was unconstitutional because it denied the equal protection of the laws "by affording a twenty (20) year

6

limitation period for paternity actions involving illegitimate children and a five (5) year limitation period for paternity actions involving legitimate children."

In Wilson, this Court utilized the rational basis test in determining the equal protection issue. We here examine the level of test to be used and the application of the statutes of limitations in paternity cases in the light of Clark v. Jeter, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). There the United States Supreme Court had before it a case involving Pennsylvania law where a child born out of wedlock was required to prove paternity to receive support from the natural father, and the suit to establish paternity was required to be brought within six years of the child's birth. By contrast, under Pennsylvania law, a child born in wedlock could seek support from his or her parents at any time.

In Clark, the United States Supreme Court determined to apply a level of intermediate scrutiny in determining the equal protection issues. The Court said:

> In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment, U.S. Const., Amdt. 14, § 1, we apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose. (Citing cases.) Classifications based on race or national origin, e.g., Loving v. Virginia, 388 U.S. 1, 11 (1967) and classifications affecting fundamental rights, e.g., Harper v. Virginia Board of Elections, 383 U.S. 663, 672 (1966), are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy (citing cases).

7

> To withstand intermediate scrutiny, a statutory classification must be substantially related to a governmental objective. Consequently, we have invalidated classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents, because "visiting this condemnation on the head of an infant is illogical and unjust." (Citing a case.)

Clark, 486 U.S. at 461.

In Clark, the Supreme Court then went on to examine the equal protection issue. It reviewed Mills and Pickett, referred to by this Court in W.C. It then went on to conclude that Pennsylvania's six-year statute of limitations violated the federal Equal Protection Clause.

Since the case at bar involves a discriminatory classification based on illegitimacy, it is appropriate for us under Clark to examine the equal protection issues here on the level of intermediate scrutiny. On that level, a statutory classification must be substantially related to an important governmental objective. That objective in this case is not hard to determine: The statutory classification is based on the state's interest in maintaining stable families and in the prevention of stale or fraudulent claims. Countervailing these state's interests here established is likewise the state's interest in requiring proper support for all children, lest they become a burden upon the state or others. A limitations statute must also be examined as to whether it affords a reasonable opportunity to bring such suits. In Mills, 456 U.S. at 105, the United States Supreme Court noted the unwillingness of a mother to file a paternity action on behalf

8

of her child, which could stem from her relationship with the natural father or from the emotional strain of having an illegitimate child, or even from the desire to avoid community and family disapproval which might continue years after the child is born. That was one of the reasons why the United States Supreme Court in Clark struck down Pennsylvania's six-year statute.

Other factors also militate against the constitutionality of our five-year statute. Under § 40-6-108, MCA, a child with a presumed father may establish the presumed father's paternity at any time, which seems to negate any argument respecting stale claims. Moreover, advances in technology relating to genetic markers found in blood tests remove much of the fear of false or fraudulent claims of paternity. We noted the reliability of such blood tests in Rose [no relation to the parties at bar] v. District Court, Eighth Judicial District (1981), 192 Mont. 341, 628 P.2d 662; Wilson, 634 P.2d at 174. Under § 40-6-113(4), MCA, a district court may require the parties to submit to appropriate tests.

Indeed the accuracy of modern blood tests removes many of the justifications asserted for a five-year limitations statute. Such tests can refute false or fraudulent claims of paternity, or provide evidence that might otherwise be unavailable through the passage of time.

This case is prosecuted by the State of Arizona under the Uniform Reciprocal Enforcement of Support Act (URESA). The principal object of URESA actions is to fix the duty of support, an object that is accomplished here. The effect of this decision

9

setting aside the five-year limitations in paternity actions should not be overestimated. We have simply set aside a time-bar that may otherwise have thwarted the truth in URESA or other paternity actions. There is no restraint under this decision that prevents a court in this state from considering other issues that might arise in such actions once the time-bar is lifted. The other provisions of URESA, as enacted in this state, take care of that. Thus our courts are not fenced off under URESA from considering other issues than support that may affect the child, or his adoptive, natural or presumed parents. Section 40-6-116, MCA, gives the Court in URESA actions broad latitude in fixing a judgment:

> 40-16-116. Judgment or order. (1) The judgment or order of the Court determining the existence or non-existence of the parent and child relationship is determined for all purposes.
>
> . . .
>
> 3(a) The judgment or order may contain any other provision directed against the appropriate party to the proceeding concerning the custody and guardianship of the child, visitation privileges with the child, the furnishing of bond or other security for the payment of the adjudgment, <u>or any other matter in the best interest of the child.</u> (Emphasis added.)

So such issues as the best interest of the child can be separately considered by the Court in URESA actions.

On consideration of these relevant factors, we find the constitutional balance is tilted. The five-year limitation in this case is not substantially related to an important governmental objective, since under our statutes the limitations vary from case to case.

We therefore determine and hold, and agree with the District Court, that the five-year statute of limitations contained in § 40-6-108(1)(b), MCA, is unconstitutional.

We bring to the attention of the legislature, if it again considers this statute, a provision of the federal Child Support Enforcement Amendments of 1984 which requires all states participating in the federal child support program to have procedures to establish paternity of any child who is less than eighteen years old. 98 Stat. 1307, 42 U.S.C. § 666(a)(5).

Affirmed.

_____
                                        Justice

We Concur:

_____
            Chief Justice


_____


_____


_____


_____

_____
            Justices

11

Justice Diane G. Barz dissenting.

Section 40-6-108(1)(b), MCA, may not be in conformity with the federal Child Support Enforcement Amendments of 1984 requiring "[p]rocedures which permit the establishment of the paternity of any child at any time . . . " 98 Stat. 1307, 42 U.S.C. § 666(a)(5), however, the statute is nonetheless constitutional. The majority asserts that this Court's earlier decisions regarding this matter are not consistent. I disagree. This Court's earlier decisions are in fact consistent. It is the majority's present opinion that does not appear to be consistent.

In Borchers v. McCarter (1979), 181 Mont. 169, 592 P.2d 941, this Court correctly held that the five-year statute of limitations barred the mother from attempting to prove the nonexistence of the presumed father and child relationship. Likewise, this Court correctly held in Matter of W.C. (1983), 206 Mont. 432, 671 P.2d 621, that § 40-6-108(1)(b), MCA, is not unconstitutional and the Montana statutes do not differentiate between children born of wedlock and children born out of wedlock. The statute rightfully protected the presumed father from having his father and child relationship challenged years later by the natural father.

It was this Court's decision in State, Department of Revenue v. Wilson (Mont. 1981), 634 P.2d 172, 38 St.Rep. 1299, holding a three-year statute of limitations unconstitutional because the statute applied to all children born out of wedlock, that pertains to the same reasoning employed by the United States Supreme Court in the line of cases holding these statutes unconstitutional.

12

In Jimenez v. Weinberger (1974), 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363, the Court struck down laws establishing disabilities on _illegitimate_ children.

In Levy v. Louisiana (1968), 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436, a wrongful death statute, which precluded recovery by _illegitimate_ children, was declared unconstitutional.

In Trimble v. Gordon (1977), 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31, a statute barring _illegitimate_ children from inheriting from an intestate father was held unconstitutional.

In Weber v. Aetna Casualty & Surety Company (1972), 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768, the Court held that _illegitimate_ children were entitled to workman's compensation benefits relating to the death of the father; and in Gomez v. Perez (1973), 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56, the Court established that _illegitimate_ children have a right to the father's support.

More recently, the Supreme Court struck down similar statutes in Mills v. Habluetzel (1982), 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770; Pickett v. Brown (1983), 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372; and Clark v. Jeter (1988), 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465. All these statutes deny _illegitimate_ children a right enjoyed by legitimate children, and were found to be unconstitutional, as was Montana's statute in _Wilson_. However, § 40-6-108(1)(b), MCA, can be easily distinguished from the unconstitutional statutes. Notwithstanding that the statute creates a classification of children to be treated differently, the

13

statute sustains more important government purpose than do the unconstitutional statutes and consequently, passes the muster of intermediate scrutiny analysis.

The precise statutory classification created by § 40-6-108(1)(b), MCA, must be accurately recognized before the intermediate scrutiny test can be properly applied. The statute does not draw a line between children born of wedlock and children born out of wedlock, and thereby deprive one class or the other of a constitutional right. It more correctly draws a line between children with presumed fathers who seek support from someone other than the presumed father and all others ("all others" include both children with presumed fathers and children without presumed fathers). The issue then becomes whether or not this classification is substantially related to an important governmental objective. The State's objective, as the majority states, is to maintain stable families and prevent stale or fraudulent claims. While it could be argued that these interests alone are important enough, there are additional interests that may be more important. The best interests of the child have always been the most salient consideration in determining family matters where children are involved. How can the best interests of the child be served by allowing paternity actions to be brought years after a child has developed a child-parent relationship with the presumed father? Upon careful examination of the statute it becomes obvious that it serves to promote legitimacy in that it ensures that the presumption of legitimacy will not be challenged,

14

once the child reaches the age of five, by anyone. In other words, once the five-year statute has elapsed, if there has been no paternity action, the child's father is the presumed father. The argument, that a child with a presumed father should have the right to seek support from the natural father at any time up to the age of majority, actually confers upon that child a right other children do not have; the right to choose their father. Such a right is not provided by the constitution. This statute simply requires any challenge to the presumed father's status to be made within five years or not be made at all. The possibility now exists that the presumed father's relationship with the child can be disrupted by an alleged natural father at any time. This situation was precisely the kind that occurred in Matter of W.C., and it was § 40-6-108(1)(b), MCA, that prevented the alleged natural father from disrupting the presumed father's relationship with his child. Once a child has reached the age of five, there unquestionably has been created a parent-child bond between the presumed father and the child. A paternity action challenging the presumed father and child relationship years after that relationship has been developed can serve only to damage and erode the bond between father and child.

Without § 40-6-108(1)(b), MCA, the possibility also exists that the presumed father will, upon discovering his spouse's malevolent transgressions years later, claim not to be the natural father and attempt to establish the nonexistence of the presumed father and child relationship. In such a scenario, the mother and

child may not, after many passing years, be able to locate the natural father for purposes of establishing a legal entitlement to support. Would it not be in the best interests of the child to continue to receive support from the presumed father and at least _have_ a father?

This is similar to the situation that occurred in Clay v. Clay (Minn. Ct. App. 1986), 397 N.W.2d 571. A presumed father attempted to establish the nonexistence of his paternity during marriage dissolution proceedings. Minnesota's three-year statute of limitations (identical to ours except it reads three instead of five years[1]) barred the presumed father from doing so and thereby appropriately protected the child. Minn. State. Ann. § 257.57 (1)(b). The constitutionality of the statute was raised and the appellate court affirmed the lower court's decision upholding the statute, saying the three-year statute "[w]as designed to promote legitimacy . . . [and] [p]ermitting a challenge to the legitimacy of a child more than three years after its birth would defeat the clear statutory purpose of promoting legitimacy." Clay, 397 N.W.2d at 577. Clay was appealed to the U.S. Supreme Court and the Court dismissed the appeal. (Clay v. Clay (1987), 484 U.S. 804, 108 S.Ct. 49, 98 L.Ed.2d 14.) Therefore, it appears the United States Supreme Court was not troubled by the constitutionality question.

In Michael H. v. Gerald D. (1989), ___ U.S. ___, 109 S.Ct.

---

[1] A 1989 Amendment rewrote the Minnesota statute to include a longer limitation (one year after the child's majority) in situations where the presumed father becomes divorced from the child's mother and is unaware of the child's birth.

16

2333, 105 L.Ed.2d 91, the United States Supreme Court looked at a statute providing that a presumption of fatherhood could be rebutted by blood tests, and only if motion for such tests was made within two years from the date of the child's birth. The Court found the statute to be constitutional and not a violation of the due process clause or the equal protection clause of the United States Constitution.

It must be re-emphasized that § 40-6-108(1)(b), MCA, affects only children that already have a presumed father. Therefore, the majority's concern that there be "proper support for all children, lest they become a burden upon the state" is unfounded because only children attempting to seek support from someone other than their presumed father, would be barred by the five-year statute of limitations. The presumed father would still be legally required to support the child because he too would be barred by the same five-year statute from doing otherwise. The present case is illustrative of this point. The majority opinion notes that the West Virginia court, in granting the divorce between Kathleen and the presumed father, Stelios, found that the parties had no children born to the marriage. If such is the case, then § 40-6-108(1)(b), MCA, has been satisfied and the presumed father's status is sufficiently rebutted within the five-year period. If such is not the case, then Stelios remains the presumed father and is obligated to support the child; in either event the child is supported.

The statute not only serves to prevent stale or fraudulent

17

claims and help maintain stable families, it also, more importantly, serves to protect the best interests of the child and the rights of the presumed father by promoting legitimacy and the sanctity of the family in which the child was brought up. The statute is not in conformity with the federal Child Support Enforcement Amendments of 1984 and should be changed, however, it is not unconstitutional as its classification is substantially related to a clearly important government interest.

_____
Diane D. Barr
Justice

18